**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 15, 2022**

# In the Court of Appeals of Georgia

A21A1500. STANLEY v. EDWARDS.

DOYLE, Presiding Judge.

Tiffany Stanley ("the mother") appeals from the trial court's order granting Quinton Edwards's ("the father") motion for modification of child custody and child support regarding the couple's two children. Stanley argues that the trial court (1) abused its discretion by granting the motion without evidence of a material change in circumstances; (2) abused its discretion by disregarding the older child's election to live with the mother; (3) abused its discretion regarding evidentiary rulings; and (4) erred by failing to include a start date for child support in its final order. For the reasons that follow, we reverse.

This Court reviews for an abuse of discretion an order modifying or declining to modify child custody and child support, and evidentiary findings will be affirmed if there is any evidence to support them.[1]

The record shows that in September 2018, the father filed a complaint for modification of child custody and child support. The complaint attached a copy of a final order on a petition for custody and visitation from June 2013, which showed that Q. E. was born November 30, 2006, and C. E. was born October 27, 2009. The mother was granted custody with the father having 48 hours of visitation every other weekend. In his complaint, the father alleged that he was seeking primary physical custody of the children because the mother

> has failed to discharge her duties and has not taken action for the furtherance of the children's well-being. Specifically, she has failed to support the needs of the minor children and allowed the children to be around immoral behavior such as partying and drugs. Furthermore, [the mother] has allowed numerous live-in boyfriends to be around the children, who have been negatively impacted by this.[2]

---

[1] See *Brazil v. Williams*, 359 Ga. App. 487, 490 (1) (b) (859 SE2d 490) (2021).

[2] The mother's trial counsel noted in opening that she filed a petition to modify child support prior to the instigation of this suit.

2

The mother initially filed a pro se answer denying these allegations, and later, she hired an attorney who filed another answer on her behalf. She also counterclaimed for an upward modification of child support, arguing that the father frequently had failed to exercise portions of his visitation since 2013, causing her to expend more resources on care of the children. On November 15, 2019, Q. E. filed an election to live with the mother.

At the bench trial in March 2020, Q. E.'s seventh grade language arts teacher testified that she had taught him through the 2019-2020 school year, and she mainly interacted with the mother until recently. She did meet with the father the week before the bench trial, and she had spoken to him once over the phone prior to that. As for Q. E.'s performance, the teacher testified that

> [Q. E.] is a very polite, likable young man. Pleasure to have in class. He is a typical seventh grade little boy. His grades are average. He does really well, I think, in math from the way [another teacher] talks. For me, he does well. He has a C average right now, but he doesn't love to read and probably could improve on that a little bit. But, you know, he's like any of my other students. They are talkative on some days. You know, they just have their days. But he is just a very good student. He's a pleasure to have in class.

The teacher had experienced no issues with Q. E. having been absent from school, and she denied knowing about any referral of him to juvenile court for school absences.[3] She noted that his grades at that time were 71 in language arts, 100 in science, 82 in math, and 72 in social studies, which were average grades for her students. When challenged by the father's attorney, she explained that eighty percent of the students at the school were two or more grade levels behind in reading. When she was given a copy of Q. E.'s sixth grade end-of-year test scores, she admitted that they were slightly lower than some of her students, but explained that the entire seventh grade was currently getting an extra hour of language arts to remediate those students who were behind. She reiterated that his scores were "slightly below average, but as I said, our population as a whole is below the state average." Moreover, Q. E. was showing growth in his reading level and had made improvements over the year, and he was involved in the school-wide reading-support program. The teacher testified that Q. E. was "a solid C student. He is below reading level[,] and I feel like the work that [Q. E.] gives me is the best that he can give me.

---

[3] This referral was apparently going to be made by the father's trial counsel after this case was filed and not by the school system or the teacher, and many of the absences were a result of Q. E. having an illness for a week.

4

I do. I have seen improvement in his reading skills[,] and I don't foresee [Q. E.] failing a class at all."

She did not notice any problem with Q. E. being absent, nor did she believe that Q. E. had a behavior problem; she denied speaking to the father about Q. E. being disrespectful. She had contacted both parents about a single occasion of Q. E. falling asleep in class, which she testified was not outside of the norm for students in her class as it included the students' lunchtime, and she had not had that problem with Q. E. again.

The teacher experienced a single instance of having been unable to reach the mother through her contact information, which was later corrected, and had otherwise been in contact with the mother fairly regularly and had not had any issue with her engagement. The attempt to contact was made about missing a weekly reading log, which was a "very regular" occurrence with all her students, not just Q. E.[4] The teacher said that during the single instance in which she had met with the father, the meeting was set up without her knowledge until the father showed up that day, and

___

[4] Specifically, the teacher explained that the assignment was a weekly at-home reading log in which the students needed to read for a prescribed amount of time and document the reading; she was "missing a lot of them" from many of the students.

she was not aware if the mother knew of the meeting.[5] As for Q. E.'s chattiness, the teacher explained that she was able to remedy the situation by separating the chatty students from each other.

The children's stepmother shares two other children with the father — a one-year-old and six-year-old — who are not the subject of this litigation. The stepmother was prohibited by the 2013 parenting plan from having direct contact with the mother or from transporting Q. E. and C. E. to and from visitation. She testified that if Q. E. and C. E. came to live at the father's home, she would work with the children on their school work, but she did not currently do so because they "don't bring it." She testified that when the mother had surgery, the father and stepmother kept Q. E. and C. E. for a week, and they helped with homework at that time.

The stepmother also testified that she threatened to "spank [Q. E.'s] butt" for speaking to her in a way that she did not like. She also called the police to come to their home after she disciplined Q. E. for pushing her six-year-old to the ground because she was afraid that the maternal grandmother would report her for punishing

---

[5] The mother later acknowledged that she was notified of the meeting, but she declined to participate because she already had the information from the teachers and because the father had already initiated the instant litigation, which she felt would negatively affect the meeting.

Q. E.[6] She admitted grabbing Q. E. by the arm, but she denied pushing him up against a door as Q. E. apparently had reported to others. Even though she allegedly witnessed Q. E. pushing her six-year-old, she immediately left the children alone again and went to a different room, and five to ten minutes later, Q. E. brought her his cell phone so she could speak to his grandmother, who was asking about the stepmother's treatment of Q. E.

The stepmother testified that the mother did not tell them about C. E.'s junior Beta Club induction. She did not state why the father did not get this information directly from the school, which she admitted he could have done in some instances.

The father testified that he worked 16 days out the month in the month prior to the trial, and he worked the swing shift, which could cause an erratic schedule. He testified that he received his schedule for one year at a time, subject to changes to cover absences. Additionally, when complaining about how the mother did not notify him about C. E.'s Junior Beta Club induction or a science event, he testified that, "[m]y job clearly tells us if you need some time off to do anything, just give us an advanced notice, so you can have your time. Give me a week in advance. If you need

[6] The maternal grandmother admitted that she spoke with the stepmother about the incident and threatened to call the police on the stepmother to sort out the details, but she denied actually calling the police.

next Thursday off, that will give us enough time to get you coverage[,] or you can set up a personal [day] to where you can have that day off." The father did not testify why this system of leave would not have allowed him to schedule around his 2 monthly 48-hour visitation periods. The father admitted that he smoked and used a "vape," but he denied offering his vape or any alcohol to the children. The father denied allowing the stepmother to physically discipline Q. E. and C. E., and he denied any incidents of violence in the home.

The mother testified that she works 40 hours a week at a daycare center, and prior to leaving for the day, she got the children ready for school and frequently drove them there unless they wanted to get up early for the bus. Both children are in after school programs. The mother conceded that she failed to tell the father about two specific events of C. E.'s but testified that she had frequently told the father about events, and he did not participate, nor did he get the information from the school himself.

On cross-examination, the mother was confronted by several pictures posted on her social media accounts that showed her with friends or alone, in short dresses or tight clothing; smoking from a hookah, which she testified contained flavored tobacco; in one instance, smoking a marijuana cigarette; and in one instance making

an obscene hand gesture with her middle finger. Many of the pictures had captions with obvious song lyrics containing curse words or other statements containing cursing or slang. The mother admitted that she smoked marijuana in the instance pictured, but she denied using the substance regularly and produced a negative drug test. The father presented two pictures of men connected to her, one in which she was also pictured, and one which contained pictures of the children. She admitted dating one of the men, but claimed the man pictured with her children from 2012 and 2014 was a family friend with whom she was not romantically involved. The father also presented a private message chain between her and a third man, with whom she was discussing sex and with whom she discussed money he owed to her, threatening to tell his wife what he was doing.

Q. E. testified that he goes to an after school program everyday at which he does an hour of either math or language arts work followed by an hour of enrichment with other teachers. At his mother's house, he also worked on reading and a math program called Prodigy, and his mother worked with him on schoolwork. Q. E. denied that his father had ever helped him with English. He admitted that he probably likes playing video games too much, but he has an enforced bedtime of 9:00 p.m. on school nights and has to finish his homework before he can play. Although he has

social media accounts, Q. E. testified that he is rarely on them, preferring to chat with his friends on the phone or through their video games; many of his friends use various social media platforms. Q. E. testified that he had not seen his mother's social media. Q. E. testified that he had seen people smoking and drinking at both his parents' houses; that his mother had alcohol at some point in front of him a few years ago; that someone at his father's house (perhaps his father although it is unclear from his testimony) had offered to allow him to smoke a vape.

Following the bench trial, the court entered a final order granting the father primary physical custody of the two children.[7] After the mother's motion for new trial was denied, this appeal followed.

1. Stanley first argues that the trial court abused its discretion by transferring custody absent reasonable evidence that there was a material change in circumstances that had an adverse effect on the minor children. We agree.

---

[7] After the trial court's order was entered, the mother's counsel withdrew, and her new counsel filed a motion for new trial, inexplicably asserting claims for a new trial usually seen in a criminal proceeding such as lack of sufficient evidence under the general grounds and ineffective assistance of counsel under *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052) (80 LE2d 674) (1984). This motion was denied after a hearing, a transcript of which does not appear in the record on appeal.

In Georgia, there is a well established two-part test which the trial court must employ before instituting a change of custody. The trial court must determine whether there has been a material change in circumstances affecting the welfare of the child since the last custody award. If so, the trial court then determines whether the child's best interests will be served by a change in custody. In other words, the best interests of the child should be utilized in deciding the case once a change in condition has been established. While a best interests of the child standard applies to an initial determination of custody, it is applicable in a change of custody action only after there has been a showing of a change in condition materially affecting the child.[8]

The trial court's order made only the following findings to support its order modifying custody:

there has been a significant and material change in circumstances so as to call the issue of custody into question in that the Mother has taken steps to alienate the children from [the] Father and has failed to apprise the Father of significant events in the children's lives. Further, the older child has significant problems in school which are simply not being addressed with sufficient urgency. Finally, the Mother's morals have been shown to be questionable at best. For those reasons, the [c]ourt finds that it is in the best interests of the minor children that the Father

_____

[8] (Citations and punctuation omitted.) *Brazil*, 359 Ga. App. at 488-489 (1), quoting *Odum v. Russell*, 342 Ga. App. 390, 392 (1) (802 SE2d 829) (2017).

11

be there [sic] primary care giver, despite the older child's desire to live primarily with his Mother.

We disagree that any of the three findings by the trial court constitute a material change in circumstance, and we address each finding in turn.

(a) *Mother's alienation of the father*.

The father identified two school events that were open to family that the mother did not tell him about — C. E.'s induction into Beta Club and C. E.'s science event. The mother testified that she had told the father about many events, but because he missed them so frequently, she ceased doing so. The father did not dispute that he missed events, blaming work or the mother, and there also was no testimony regarding his actual attendance at events prior to these two.

The father agreed that he also previously missed visitation and argued it was based on his work schedule. And although he claimed to be able to get coverage or take time off, he did not explain why this leave system would have prevented him from scheduling around his 2 monthly 48-hour visitation periods or why it had prevented him from attending school events in the past about which he had received notification. Additionally, the original custody order was entered after he had begun working at the same job he had at the time of the modification action, but he failed

12

to request any sort of modified visitation schedule at that time based on his work needs.

Moreover, there is no evidence that the mother spoke negatively about the father to the children or that they held a negative view of the father based on anything the mother said or did. There was no evidence that the mother prohibited the father from calling the children on their cell phones and no evidence that she refused to discuss the children with him if he had called with an issue at some point prior to the instigation of this litigation.[9]

Although the mother should have given the father notice of the events if the information was not otherwise provided by the school, it is clear from the record that the animosity between the parties had been ongoing throughout their relationship and began prior to the original order being entered. Nor was there any new or escalating

---

[9] Compare with *Hooper v. Townsend*, __ Ga. App. __ (Case No. A21A1293; Jan. 19, 2022) (affirming modification of custody based in part on mother's alienation of the child from the father, stating that "the mother obtained an ex parte temporary protective order to circumvent the father's parenting time, consistently failed to make the child available to the father by phone or video call, falsely represented that the child had a medical condition or travel/activity restriction to circumvent parenting time by the father, and coached the child to "reframe his interpretation of life events and experiences to reflect negatively upon [the father] and [the father's] family."). We acknowledge that the mother declined to attend the meeting at the school the week prior to the bench trial because of the instant litigation, but that does not appear to be an ongoing issue based on the evidence.

manifestation of it on the part of the mother, and therefore, it would not present a new circumstance or material change in circumstance to support the trial court's order.[10]

(b) *Q. E.'s significant school problems*.

It is clear from the record that Q. E. has a difficult time with reading. The maternal grandmother testified that he has always had such difficulty, and the mother and she have always worked with the children on reading and their school work. The bulk of his difficultly seems to have arisen during the transition to middle school in the fifth grade, and not any issue with parenting by the mother. Q. E. testified that the mother makes him do his homework every night and that the children have a 9:00 p.m. bedtime. Q. E. also testified that he spends two hours per day after school for remediation and enrichment, which was corroborated by his teacher's testimony.

---

[10] See, e.g., *Cousens v. Pittman*, 266 Ga. App. 387, 390 (597 SE2d 486) (2004) ("The trial court recited only that the relationship between the child and her father was 'being irreparably harmed' and that the child suffered emotionally from the 'bickering' of both parents. While we may agree with the trial court's finding that the child suffers because of the behavior of her parents, we have found no evidence in the record that the parents' behavior is either new or a material change in circumstances. To the contrary, the 'bickering' has occurred continuously since the parents' divorce."). See also *Steed v. Steed*, 356 Ga. App. 194, 196 (1) (843 SE2d 21) (2020) ("Having found that the litigious family dynamic was a result of the parents' hostile relationship, the trial court then correctly concluded that there was no material change in circumstances."); *Park-Poaps v. Poaps*, 351 Ga. App. 856, 862 (2) (833 SE2d 554) (2019) ("[P]arental discord that has been ongoing since before the prior custody award does not constitute a material change in circumstances.").

14

Moreover, the only disinterested party who testified and the most qualified person to give an opinion as to aptitude — Q. E.'s teacher — stated that "[h]e is below reading level[,] and I feel like the work that [Q. E.] gives me is the best that he can give me. I do." Neither the father nor the stepmother explained what they would be able to do that would be different than the remediation Q. E. was already receiving.[11] Indeed, Q. E. testified that the father had never helped him with reading. Based on this evidence, it appears that Q. E. has always had an issue with reading, it was known to the school and the parties, and it was not the result of any conduct on the part of the mother.[12] Moreover, beyond speculation, there was no evidence that any change in custody

---

[11] The stepmother testified that she was worried about Q. E. academically, but she did not state when her worry began or whether she or the father had done anything to remediate his skills during their current visitation even though she testified that she downloaded academic computer applications for her own children; instead, she testified that their normal visitation with Q. E. and C. E. usually involved watching movies or playing games. There was a great deal of testimony by the father about gang activity or the potential for gang activity or other discipline problems, but this was either speculative or contrary to the teacher's testimony. There were two reports from a bus driver of a group of children including Q. E. who were acting disruptive on the bus, but this in no way appeared linked to gang activity.

[12] See *Park-Poaps*, 351 Ga. App. at 862-863 (2) (explaining that the moving party had the burden to show that there is a material change in circumstances before the trial court can grant a modification and pre-existing conditions do not constitute a change in circumstances).

15

would improve or remedy the situation. Accordingly, this finding does not support the modification of custody.

(c) *Mother's questionable morals.*

Introduced at trial by the father were several social media posts that showed the mother dressed up to go out with girlfriends. Many of them had what were clearly music lyrics quoted over top or captioned below. None of the photographs showed the mother or her friends nude or engaged in sexually explicit conduct. The father also attempted to show that the mother had a number of "live-in boyfriends" with her posts or that she was working as an escort. Even assuming that the mother was working as an escort or that she had a series of boyfriends over the seven years since the entry of the initial custody order,[13] there is no evidence that the children were aware of or met anyone other than the person from pictures dated 2012 and 2014, whom the mother claimed was a family friend.

There is no evidence beyond the father's attorney's speculation that any of her social media posts containing curse words or the picture of her middle finger (1) were seen by the children; (2) were indicative of the way the mother behaved when she was parenting the children; or (3) had any negative effect on the children. The father's

---

[13] There was no evidence of a live-in boyfriend.

attorney made much of the fact that the mother was unaware that Q. E. had a Facebook account, which the child testified he made "a long time ago" and did not use, preferring to communicate with his friends on other social media outlets or on his cellphone; however, the father also was unaware that Q. E. had a Facebook page, testifying on the second day of trial that he "just realized that yesterday" when it was brought up by his attorney during the first day of trial. Additionally, Q. E. testified that he saw smoking and drinking by people at both his mother's and father's homes, that he saw a person with a gun at his father's house, and that someone offered to let him vape at his father's house (the father also admitted that he smoked and used a vape). There is no evidence that any of the mother's behaviors pointed to in the photographs constituted new circumstances because several of the pictures were from before the initial custody order was entered or soon thereafter. More importantly, there is simply no evidence showing that the children were aware of any of the mother's conduct to which the father objected or that they had been negatively affected thereby.[14]

---

[14] See *Beckman v. Beckman*, __ Ga. App. __ (Case No. A21A1575; decided Feb. 23, 2022) ("The focus must be on the needs of the child, not the faults of the parents. In some instances a parent's immoral conduct might warrant limitations on the contact between parent and child; but only if it is shown that the child is exposed to the parent's undesirable conduct in such a way that it has or would likely adversely

17

Too long have courts labored under the notion that divorced parents must somehow be perfect in every respect. The law should recognize that parents, married or not, are individual human beings each with his or her own particular virtues and vices. . . . In domestic relations cases the courts should recognize that all parents have faults, and look not to the faults of the parents, but to the needs of the child.[15]

We are mindful of the showing necessary to establish an abuse of discretion in such an instance, but based on the testimony and evidence presented, which consisted largely of the continuation of long patterns of behavior among the parties over the years and testimony about the mother with no connection to her parenting with any adverse impact to the children, the mother has succeeded in meeting this burden.[16] Accordingly, the order granting the father's petition for modification is hereby reversed.

---

affect the child."), quoting *In the Interest of R. E. W.*, 220 Ga. App. 861, 863 (471 SE2d 6) (1996).

[15] (Punctuation omitted.) *In the Interest of R. E. W.*, 220 Ga. App. at 864, quoting *Conkel v. Conkel*, 31 Ohio App. 3d 169, 171 (509 NE2d 983) (Ohio Ct. App. 1987).

[16] See *Cousens*, 266 Ga. App. at 390-391. See also *Steed*, 356 Ga. App. at 196-197 (1); *Park-Poaps*, 351 Ga. App. at 862-863 (2).

2. Based on the foregoing, we need not address the mother's remaining enumerations of error.

*Judgment reversed. Reese and Brown, JJ., concur*.